IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

HAROLD J. WHEELER
LAWYER WHEELER, JR.                                                              PETITIONERS

v.                                                                                        No. 4:01CR109-B

UNITED STATES OF AMERICA                                                         RESPONDENT

**MEMORANDUM OPINION**

This matter comes before the court on the April 1, 2004, petitions by Harold J. Wheeler and Lawyer Wheeler for writs of *habeas corpus* under 28 U.S.C. § 2255, and the various amendments to those petitions. The court heard additional evidence at an evidentiary hearing that spanned four days, and the court has granted, received and reviewed additional briefing after the four-day hearing. The petitioners have made their arguments; the government has responded. The matter is ripe for decision. For the reasons set forth below, the instant petitions for writs of *habeas corpus* shall be denied.

**Procedural Posture**

On September 19, 2001, a federal Grand Jury returned a six-count Indictment charging defendants Harold J. Wheeler and Lawyer Wheeler, Jr. with knowingly and willfully making materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of an agency of the U. S. Department of Agriculture ("USDA"), pertaining to their applications for crop insurance benefits and disaster assistance on their 1998 cotton crops in Leflore and Carroll Counties (Harold J. Wheeler d/b/a CMC Farms) and in Sunflower County (Lawyer Wheeler, Jr.).

The first two counts charged the Wheelers with falsifying on crop insurance forms that CMC Farms had completed its planting of cotton on May 15, 1998 on two tracts of land in Leflore County (Count One) and on May 18, 1998, on a tract of land in Carroll County (Count Two), in violation of 18 U.S.C. 1001(a)(2).

Count Three charged Lawyer Wheeler, Jr. individually with falsifying a crop insurance acreage form that he completed his cotton planting on a tract of land in Sunflower County on May 25, 1998, in violation of 18 § 1001(a)(2).

Count Four charged Lawyer Wheeler, Jr. with making a materially false, fictitious and fraudulent statement and representation in a matter within the jurisdiction of the Farm Service Agency ("FSA"), an agency of the USDA. Specifically, Count Four charged that in applying for disaster payments on his 1998 cotton crop in Sunflower County on Form CCC-540A, Notice of Loss/Production Worksheet, 1998 Crop Loss Disaster Assistance, Lawyer Wheeler, Jr. stated that he had planted his cotton on May 26, 1998, when in fact he knew the cotton was planted after May 26, in violation of 18 U.S.C. 1001(a)(2).

Count Five charged Harold J. Wheeler with concealing and covering up by trick, scheme and devise, in applying for disaster assistance on the 1998 cotton crop of CMC Farms in Carroll County, that the cotton had not been planted until well after the May 25, 1998, cotton planting deadline, in violation of 18 U.S.C. 1001(a)(1).

Count Six charged Harold J. Wheeler with knowingly and willfully making a materially false, fictitious and fraudulent statement and representation in a matter within the jurisdiction of the FSA, an agency of the USDA. Specifically, Count Six charged that in applying for disaster payments on the 1998 cotton crop of CMC Farms on Farm Serial Number 2104 (Marie Place)

and 2297 (Hardrock Place) in Leflore County, on Form CCC-540A, Notice of Loss/Production Worksheet, 1998 Crop Loss Disaster Assistance, Harold J. Wheeler stated that he had planted the cotton on May 25, 1998, when in fact he knew the cotton was planted after May 25, 1998, in violation of 18 U.S.C. 1001(a)(2).

Trial was originally scheduled for November 13, 2001, in Oxford, Mississippi, but was continued three times at the defendants' request. Trial began May 20, 2002, in Oxford. When the government rested, the defendants moved for Judgments of Acquittal. Judgment Of Acquittal was granted on Count Five against Harold J. Wheeler, but denied as to the remaining counts. On May 25, 2002, the jury returned its verdicts finding Harold J. Wheeler guilty on Count Six and not guilty on Counts One and Two, and Lawyer Wheeler, Jr. guilty on Count 4 and not guilty on Counts One, Two, and Three. Thus, the false material statements for which the Wheelers were convicted were their representations as to the dates they planted cotton on their various farms.

Following trial, the defendants filed a joint motion for Judgment of Acquittal; the court overruled that motion on July 24, 2002. Both the government and defendants had objections to the presentence investigation report. Sentencing was held on September 10, 2002, in Oxford. The defendants' objections as to guideline loss were overruled. The government's objections as to guideline loss and non-inclusion of abuse of position of trust were overruled. The government's objection as to more than minimum planning was sustained. On a sentencing range of eighteen to twenty-four months, Harold J. Wheeler was sentenced to prison for 18 months, fined $20,000, and ordered to pay a special assessment of $100 and costs of imprisonment. On a sentencing range of twelve to eighteen months, Lawyer Wheeler, Jr. was

sentenced to prison for twelve months and 1 day, fined $5,000 and ordered to pay a special assessment of $100.

From those judgments, the defendants appealed. After briefing and oral argument, the Court of Appeals affirmed the convictions and sentences of both defendants by unpublished opinion of October 31, 2003. *United States v. Wheeler*, No. 02-60830 (5th Cir. 2003).

**The Instant Petitions Filed Under 28 U.S.C. § 2255**

The defendants filed simultaneous motions to vacate, correct, or set aside their sentences under 28 U.S.C. § 2255 on April 1, 2004, alleging four grounds for relief, which the court summarizes below:

1. Counsel was ineffective for failing to argue that the petitioners were actually innocent of the crime for which they were convicted – submitting false, material statements to the government for pecuniary gain from FSA. Any statements made, even if false, were not material for two reasons.[1] First, the applications for disaster relief were submitted beyond the deadline and thus ineligible for consideration. Second, the crop in question was non-irrigated cotton planted behind harvested wheat, which was excluded from crop insurance coverage in 1998 – and thus was not eligible for disaster relief benefits as a matter of law.

2. The petitioners were sentenced under erroneous substantial data because the court used the raw data from Producer Entitlement Reports to determine the amount of money the petitioner's stood to gain under the disaster relief program – and thus the amount of loss used to determine the petitioners' sentences. The figures from the Producer Entitlement Reports, however, were subject to reduction under FSA regulations, including Crop Loss Disaster Assistance Program ("CLDAP") yield reduction factor of thirty-three percent for irrigated cotton planted behind harvested wheat, and a National Payment Factor, which would reduce the amount of payment another 15.1 %. In addition, using the rationale from Ground One, above, the non-irrigated cotton planted behind harvested wheat for each petitioner should not have been eligible for disaster relief benefits at all; thus, the amount of loss involving those crops should have been set to zero.

3. The petitioners' counsel was ineffective for failing to argue the sentencing strategy outlined in Ground Two, above.

---

[1]This issue was the focus of four days of hearings and will be discussed in much greater detail below.

4. The government failed to disclose material exculpatory evidence to the petitioners in the form of notes taken by government agent Tom Bierman during conversations with insurance agent Jimmy Goss and insurance adjuster Luther Fredericks. The notes contradicted the testimony of these two witnesses at trial and would have served to impeach those witnesses.

The government filed a memorandum brief on June 2, 2004, in response to the § 2255 motions, and the petitioners replied on June 17, 2004. Harold J. Wheeler filed a supplement to his § 2255 motion July 9, 2004, and upon direction from the court, the government responded to the supplement November 22, 2004. Harold J. Wheeler filed another memorandum brief in support of his motion to vacate December 17, 2004.

The court held a four-day hearing on the matter beginning December 20 and 21, 2004, when the court continued the hearing, and reconvening for January 10 and 11, 2005. At the conclusion of the hearing, the court dismissed all of the Wheelers' grounds for relief except Ground One: threshold ineligibility of the petitioners for disaster relief benefits. The court ordered further briefing on this remaining ground, which all parties filed with the court. Briefing is complete.

**Procedural Bar**

The government has argued that the broad issue of materiality is procedurally barred because that issue was found against the petitioners at trial and on direct appeal, citing *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994). The false statements the government used to charge the petitioners were the planting dates on the crop insurance and disaster relief forms. In rendering a verdict of guilty on the disaster relief charge under 18 U.S.C. 1001(a)(2), the jury of necessity found the planting dates on the application for disaster relief to be material. In

addition, the petitioners argued on direct appeal that the planting dates were not material because:

1. the disaster form (CCC-540A) does not have a specific blank for the planting date,

2. the FSA employee in Carroll County did not ask Harold Wheeler for a planting date,

3. the FSA downloaded the planting date from the crop insurance form, and

4. the entitlement forms had already been prepared.

The government argues that the jury, which was instructed on materiality, rendered a verdict of guilty on the charge, and that the Fifth Circuit discussed materiality on appeal; for these reasons, the government believes the instant claim is procedurally barred.

Whether a given statement is material – in the present context or another – can be analyzed in countless ways. The petitioners argue now that the crops at issue were not covered by crop insurance and thus – as a matter of law – those crops could not be covered under disaster relief. They argue that trial and appellate counsel should have recognized this threshold ineligibility for disaster relief benefits as a defense – and used that defense. This claim was not presented to any court until the petitioner's filed the instant *habeas corpus* petition under 28 U.S.C. § 2255. As such, the petitioners do not face a procedural bar, and the court is free to evaluate the claim.

## The Planting Dates on the Petitioners' Applications for Disaster Relief Were False

The evidence adduced at trial, summarized below, showed overwhelmingly that the petitioners submitted false statements on their disaster relief application forms. The planting dates on the forms were far earlier than the actual dates of planting established through testimony of farmers in the area who saw the wheat crops in the fields prior to the planting of the cotton and

documentary evidence of the dates the petitioners purchased and received cotton seed used to plant these crops. In 1998, Harold J. Wheeler was the managing partner of CMC Farms, a partnership which farmed several tracts including Marie Place and Hardrock Place in Leflore County and Foot of the Hills in Carroll County. TR. 1332-3. Harold J. Wheeler actively farmed on a day-to-day basis and made all of the major decisions for CMC Farms, including what crops to plant and when to plant them. TR. 1332-3.

Lawyer Wheeler, Jr. was an employee of CMC Farms and entrusted by his brother, Harold, to represent CMC Farms with crop insurance agents, seed suppliers and others. TR. 1032-3; 1333. Lawyer Wheeler, Jr. also farmed his own rented tract on the penitentiary grounds at Parchman in Sunflower County. TR. 1033-4.

In the fall of 1997, Harold and Lawyer Wheeler, Jr. decided to plant wheat on Marie, Hardrock and Foot of the Hills and the Parchman Place rented by Lawyer Wheeler, Jr. TR. 1283-4. The wheat came to harvest in late May and June of 1998. TR. 408-23. Wheat tickets showed that wheat grown by CMC Farms was delivered to grain elevators, beginning on May 23, 1998, and continuing until June 12, 1998. TR. 387-407. CMC Farms' wheat was delivered to the elevators on May 23, 24, 25, 26, 27, 28, 29 and June 1, 2, 3, 4, 5, 8, 9, 10, 11, and 12, 1998. TR. 387-407. Elevator wheat tickets showed that the wheat grown by Lawyer Wheeler, Jr. on the Parchman Place in Sunflower County was delivered to the elevator on only two consecutive days, June 11 and 12, 1998. TR. 394-407.

A local trucking firm was hired to haul the wheat from the various farms to the grain elevators. TR. 408-423. The trucker testified that he hauled the wheat from CMC Farms in Leflore and Carroll Counties and Lawyer Wheeler, Jr.'s farm in Sunflower County as the farmers

were cutting the wheat. TR. 408-423. The trucker made continuous trips to the elevator on the same day the wheat was harvested or first thing the next morning if he had a load on his truck after the elevators closed. TR. 413-414. The trucker confirmed that the first tickets for CMC Farms were on May 23, 1998 and the last tickets were on June 12, 1998, and the wheat from the farm in Sunflower County went to the elevator on June 11 and 12, 1998. TR. 394-407.

The Wheelers ordered 140 bags of cotton seed from Lewis Feed and Seed in Drew, on May 26, 1998. TR. 425-432. Sanders Seed, the supplier of Lewis, took the order of 140 bags, but could only fill thirty-three bags, which were picked up by a truck driver of Lewis and carried to the Lewis store. TR. 425-432; 440-450; 1405-1410. Lawyer Wheeler, Jr. picked up the thirty-three bags of seed on June 3, 1998, at the Lewis store in Drew. TR. 444. The remaining 107 bags on the 140 bag order were filled on June 4, 1998, and picked up by Lawyer Wheeler, Jr. on June 4, 1998, or later. TR. 431; 444-445. On June 10, 1998, CMC Farms ordered an additional forty bags of cotton seed. TR. 431-432. Lawyer Wheeler, Jr. picked up twenty of the forty bags of seed on June 11, 1998. Tr. 446. Another employee of CMC Farms picked up the remaining twenty bags on June 15, 1998. TR. 446-447. CMC Farms purchased all of its 1998 cotton seed through Lewis. TR. 1109; 1366-7. Lawyer Wheeler, Jr. used the cotton seed purchased by CMC Farms on Parchman Place in Sunflower County. TR. 1114. Thus, the defendants purchased their first cotton seed in 1998 on June 3 – the last on June 15. TR. 440-450.

Various witnesses described activity on the four farm tracts in question. The Executive Director of FSA in Carroll County testified that in certifying CMC Farms' wheat acreage, he visited Foot of the Hills in Carroll County on June 5, 1998, where he saw the remaining stubble from a wheat crop which had been burned off. TR. 570-596. He returned to there on June 19,

1998, and saw 1 ½" - 2" tall cotton in the cotyledon stage with no true leaves, indicating that the cotton had emerged about one or two days before. TR. 582-584. Hence, the petitioners harvested wheat from Foot of the Hills by June 5, 1998 – and planted cotton there before June 19, 1998.

Drew Strain farms land near Foot of the Hills. TR. 611-623. On June 25, 1998, Strain noticed cotton plants two to three inches tall on the same field where wheat had been harvested. TR. 611-623.

Kenneth Carver farms a tract encircling Hardrock in Leflore County. TR. 556-569. Carver noticed that where the wheat had been harvested on Hardrock, cotton was growing. TR. 556-569. Eugene Rosebud, who had helped Carver plant his cotton and soybeans, left Carver's employ on May 28, 1998. TR. 556-569. In June, Carver saw Rosebud planting cotton for CMC Farms on Hardrock. TR. 556-569. The cotton on Hardrock was not worked in a husbandry-like manner. TR. 568-569.

Earl Barham's farm is directly across the Yazoo River from the Marie Place, providing Barham a good view of Marie. TR. 461-518. Barham noticed wheat being harvested off Marie in June; afterwards, the remains of the wheat were burned off. TR. 461-518. Barham then noticed cotton planted on Marie Place in the latter part of June; the cotton emerged in early July, 1998. TR. 461-518.

In 1998, Danny Cockrall worked at a business which was surrounded by the Marie Place. TR. 519-523. Cockrall had a good view of the Marie Place both at work and by driving by three to four times a day. Cockrall noticed that after the wheat was harvested on Marie, the wheat stubble was burned off, the land was prepared for planting, and – on or two weeks later – cotton

was planted on Marie. TR. 519-523. The cotton planting on Marie continued until approximately June 27, 1998, Cockrall's birthday. TR. 522-523.

Sidney Shurden is employed by the state as farm manager at Parchman and was familiar with the activities on Lawyer Wheeler, Jr.'s Parchman Place in 1998. TR. 623-629. Shurden observed the Parchman Place on June 15 or 20 and noticed that something had been planted in wheat stubble but had not yet emerged. TR. 623-626. In early July, Shurden noticed that 2" tall cotton had emerged in the cotyledon stage, but was not a workable stand, with a cotton stalk about every 5 feet. R. 626-629.

Both CMC Farms and Lawyer Wheeler, Jr. took out crop insurance on their 1998 cotton crops. On July 6, 1998, crop insurance acreage reports were completed by insurance agent Jimmy Goss and Lawyer Wheeler, Jr., on behalf of himself on the Parchman Place and his employer, CMC Farms, on Marie, Hardrock and Foot of the Hills. TR. 283-284. The acreage reports, signed and certified by Lawyer Wheeler, Jr., stated that cotton planting was completed on the various places as follows: Marie – May 15, Hardrock – May 17, Foot of the Hills – May 18, Parchman – May 23. TR. 248-284. Goss filled in the planting dates using the dates Lawyer Wheeler, Jr. told him. TR. 248-284.

After the cotton harvest in 1998, CMC Farms reported cotton production on the various places, as follows: Marie – 56 bales on 557 acres, Hardrock – 3 bales on 157 acres, and Foot of the Hills – 11 bales on 83 acres. TR. 262-276. Lawyer Wheeler, Jr. reported production on Parchman of zero bales on 300 acres of cotton. TR. 287-288.

Based on this production – and the acreage reports indicating that the cotton planting was completed prior to the May 25 final planting date for cotton – Rural Community Insurance

Services granted full insurance coverage with no reductions and paid CMC Farms $137,543 on the Marie claim, $41,581 on the Hardrock claim, and $23,332 on the Foot of the Hills claim for a total of $202,456. TR. 639-668. Rural Community Insurance Services approved Lawyer Wheeler, Jr.'s claim on Parchman of $61,328, and after subtracting the premium and administrative fee, issued a check to Lawyer Wheeler, Jr. in the amount of $56,063. TR. 671-672. The Government bore most of the risk and reimbursed the insurance company for the claim payments. TR. 633-634.

The facts adduced at trial proved overwhelmingly that the planting dates on the petitioner's crop insurance and disaster relief applications were incorrect. The planting dates shown on the applications are far earlier than the dates established by the testimony of numerous witnesses. Indeed, the petitioners in this case were harvesting wheat from the tracts of land in question until long after the May 15, 1998, cutoff date for planting cotton. Thus, the statements on the petitioners' disaster relief applications were demonstrably false; the only question left is whether they were material. As discussed below, the court finds that the planting dates on the petitioners' disaster relief applications were material.

## Materiality

The petitioners argue that the planting dates on their disaster relief applications were not material for two reasons: (1) the applications were not timely filed and thus could not be accepted, and (2) the crop losses at issue were not covered under the 1998 statutes governing disaster relief, and, as such, the petitioners could not have received disaster relief benefits no matter what they listed as their planting dates. Neither argument is persuasive.

## Materiality - Timeliness of the Applications

First, the applications were timely filed. The original deadline for filing a 1998 disaster relief application was April 9, 1999. Harold Wheeler filed his applications April 5, 1999, four days prior to the deadline, and informed Leflore County FSA Service Technician Brenda Ricks ("Ricks") that the crop insurance download data did not list all of his acreage. Ricks asked if Harold Wheeler had notified the RMA of the discrepancy, and he said that he had done so. Ricks corrected the acreage with a pen and told Harold Wheeler that she would call him back into the office to sign for the correct acreage. Harold Wheeler then returned to the office May 12, 1999, to sign for the corrected acreage.

Signing for the corrected information was merely a continuation of the process begun April 5, 1999. The provision for supplementing an application is provided in 7 C.F.R. 1477.105:

> **Time For Filing Application**
>
> (a) Applications for benefits under subpart B, the 1998 Crop Loss Disaster Assistance Program Single Year 1998 losses, shall be filed before the close of business on April 9, 1999, in the County FSA Office serving the county where the producer's farm is located for administrative purposes....
>
> . . .
>
> (c) The Deputy Administrator may grant general exceptions to these deadlines for filing applications.

In addition, Section 1477.102 (introduced at the hearing as Government's Exhibit 3 and at trial as part of Government's Exhibit N-1) states in pertinent part:

> (e) The Deputy Administrator may authorize the State and county committees to waive or modify deadlines or other program requirements in cases where lateness or failure to meet such other requirements does not adversely affect the operation of the program or when, in his discretion, it is determined that an exception should be allowed to provide for a more equitable distribution of benefits

consistent with the goals of the program provided for in this part.

1-DAP, Paragraph 1093A, Page 10-245 (Government's Exhibit 4) provides:

County Offices received a single-year CLDAP RMA file containing all producers who purchased insurance on a 1998 insurable crop in that county.

This file is used to pre-fill data on CCC-540 and CCC-540A to provide automated support to the CLDAP application process.

***The single-year CLDAP RMA file will be supplemented occasionally, because RMA will be continually providing updates of producers' loss records to KCMO for mainframe processing and download to County Offices***.  (emphasis added).

Testimony during the January 28 U.S.C. § 2255 hearings established that 1998 was the first year the government used such downloads to provide pre-filled forms to the various FSA offices, and missing data was a common occurrence during that trial year.  Thus, the disaster relief application deadline was extended to June 25, 1999, for accepting late-filed applications where the case is highly meritorious and the cause for tardiness is beyond the producer's control.  Government's Exhibit 1; Jan. Tr., 256-257.  In this case, Leflore County did not find it necessary to treat CMC Farms' disaster application as late; it was clearly a correction to a timely filed application.  Jan. Tr. 261-262.  The extension was nevertheless available, and the CMC Farms situation was one in which the extension would clearly have applied.

For these reasons, the petitioners have not proved that their disaster relief applications were untimely filed; as such, they cannot use this rationale to establish that the planting dates on those applications were not material.

**Materiality - Claims Were Not Eligible for Disaster Relief**

The great bulk of the 28 U.S.C. § 2255 hearings in this case involved this single issue.  The petitioners argue that two of the three tracts in question were excluded from crop insurance

-13-

coverage and were thus automatically ineligible for disaster relief benefits. The petitioners point to a provision in the statutes governing crop insurance (not disaster relief) which excludes from coverage non-irrigated cotton planted behind harvested wheat. Several of the petitioner's witnesses testified at the hearing that they believed ineligibility for crop insurance benefits would lead to ineligibility for disaster relief payments. Thus, the petitioners urge, the dates on the disaster relief application forms were not material as they did not have a natural tendency to influence, or were not capable of influencing, a decision by the Department of Agriculture. *United States v. Gaudin*, 515 U.S. 506, 509 (1995). The petitioners believe trial and appellate counsel were ineffective for failing to raise this defense.

After four days of hearings on the matter, however, the court finds that all of the tracts were eligible for payment under the disaster relief program, and counsel were not deficient for failing to raise it as a defense.

**Disaster Relief Benefits Were Available for the Crops at Issue**

Disaster relief benefits were available for the crops in question in 1998. Eligible crops for 1998 single-year CLDAP[2] include:

- *NAP crops defined according to 1-NAP*

- crops for which federal crop insurance is available, regardless of whether insurance was purchased

- trees from which a crop is harvested.

1-DAP, § 1025A (emphasis added).

Crops eligible for the NAP (Noninsured Assistance Program) are set forth in the Code of

---

[2]The acronym for Crop Loss Disaster Assistance Program is "CLDAP."

Federal Regulations:

> (a) Crops that are eligible for NAP benefits are *any commercial agricultural crop* (excluding livestock and their by-products), commodity, or acreage of a commodity *grown for* food or *fiber for which catastrophic coverage is not available.*
>
> . . .
>
> (b) NAP payments will be made available for:
>
> . . .
>
> (3) *any commercial crop grown for fiber*, excluding trees grown for wood, paper, or pulp products.

7 C.F.R. § 1437.4(a) and (b) (emphasis added).

Disaster benefits are available for the subsequent crop on double-cropped acreage if the crop is planted within the normal planting time and good farming practices are used. 7 C.F.R. Section 1477.205(b) (Government's Exhibit 16) provides:

> (b) In cases where there is a repeat crop, double crop or a multiple planting, each of these crops may be considered different crops if the county committee determines that:
>
> > (1) Both the initial and subsequent planted crops were planted with an intent to harvest:
> >
> > (2) The subsequent crop was planted after the time when the initial crop would normally have been harvested;
> >
> > (3) Both the initial and subsequent planted crops were planted within the normal planting period for that crop; and
> >
> > (4) Both the initial and subsequent planted crops meet all other eligibility provisions of his part including good farming practices.

Jan. Tr., 282-283. These provisions are also included in the 1998 disaster program handbook procedures, 1-DAP, paragraph 1025D, page 10-68 (Government's Exhibit 17). Jan. Tr., 283.

The disaster relief program even provides for reduced benefits when a producer uses poor farming practices or plants late. As shown in government exhibit 18, 7 C.F.R. Section 1477.110 provides in pertinent part that:

> (d) County committees will assign production when the county committee determines:
>
> . . .
>
> (2) The loss is due to an ineligible cause of loss or practices that cause lower yields than those upon which the historic yield is based:
>
> . . .
>
> (4) The crop is planted beyond the normal planting period for the crop; ...
>
> . . .
>
> (g) Assigned production for crops planted beyond the normal planting period for the crop shall be calculated according to the lateness of planting the crop. If the crop is planted after the final planting date by:
> (1) 1 through 10 calendar days, the assigned production will be based on one percent of the payment yield for each day involved.
> (2) 11 through 24 calendar days, the assigned production will be based on 10 percent of the payment yield plus an additional two percent reduction of the payment yield for each days of days 11 through 24 which are involved.
> (3) 25 or more calendar days or a date in which the crop would not reasonably be expected to mature by harvest, the assigned production will be based on 50 percent of the payment yield or such greater amount determined by the county committee to be appropriate.

Similar late planting provisions are included in 1-DAP, paragraph 1065E, page 10-174 (Government's Exhibit 19). Jan. Tr., 284-286.

The government's documentary evidence and the testimony of its expert conclusively established that disaster relief was available for the tracts involving non-irrigated cotton planted behind harvested wheat. The petitioners put on several witnesses who pronounced their belief

-16-

that such a practice would prevent recovery under the disaster relief program, but they failed to produce any statutory or regulatory authority to uphold that position. As such, the petitioner's claims on this point must fail.

## The Petitioners' Representation at Trial and on Appeal Was Constitutionally Adequate

The petitioners' remaining claim is based upon a theory of ineffective assistance of counsel. They urge that trial counsel was deficient for failing to argue that non-irrigated cotton planted behind harvested wheat was ineligible for disaster relief benefits. The petitioners also argue that trial counsel should have called sixty-two additional witnesses to show the petitioners' good character and to establish that double-cropping non-irrigated cotton behind harvested wheat was a good farming practice. In order to establish a claim of ineffective assistance of counsel, the "petitioner must demonstrate both that his counsel's performance was *deficient* and that the deficient performance of counsel *prejudiced* the defendant (prejudice prong)." *Amos v. Scott*, 61 F.3d 333, 347-348 (5th Cir. 1995) (emphasis added), *Strickland v. Washington*, 466 U.S. 668, 689 (1984). In order to prove that counsel was deficient, a petitioner must prove that "counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687, *United States v. Faubion*, 19 F.3d 226, 228 (5th Cir. 1994). The court must use a deferential "objective standard of reasonableness," carrying a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, *Amos*, 61 F.3d at 348.

A *habeas corpus* petitioner must then show prejudice – "a reasonable probability that, but

for counsel's unprofessional error, the result of the proceeding would have been different." *Id.* The prejudice must be so great that the proceeding has been rendered "fundamentally unfair." *Faubion*, 19 F.3d at 228. Indeed, a court may "dispose of [an ineffective assistance of counsel] claim based solely on a petitioner's failure to meet either prong of the test." *Amos*, 61 F.3d at 348. Finally, a court must not substitute its own judgment – using the crystal clarity of hindsight – for the judgment of counsel navigating the often murky waters of litigation. *Strickland*, 466 U.S. at 679, *Faubion*, 19 F.3d at 232.

First, the legal theory upon which the petitioners base this *habeas corpus* claim is flawed. The court has found that the false statements the petitioners submitted on their disaster relief applications *were* material because the FSA could have used those statements to pay the disaster relief claims. The petitioners' instant *habeas corpus* claim of ineffective assistance of counsel thus fails for that reason alone. Further, the strategy the petitioners now set forth for the two counts upon which they were convicted would have been at odds with the largely successful strategy used by their counsel at trial, in which the petitioners were acquitted of several counts.

It took four days of hearings and several rounds of briefs to address the issue of whether, for the 1998 crop year, non-irrigated cotton planted behind harvested wheat was eligible for disaster relief. The government's expert, Steve Peterson, FSA National Office Supervisory Programs Specialist, elucidated this area of the law for the court. He is stationed in Washington, D.C. and was instrumental in drafting the procedures for implementing the disaster relief legislation. The court finds Mr. Peterson's testimony persuasive.

The petitioners' counsel at trial adopted the strategy to test the credibility of the petitioners against that of the government's witnesses. Trial counsel took the position that non-

irrigated cotton planted behind harvested wheat *was* eligible for disaster relief benefits – and that the petitioners orally gave accurate information regarding the planting dates, but government employees filled out the disaster relief applications incorrectly. In addition, a problem facing Lawyer Wheeler in this case is that he had been paid approximately $50,000.00 in crop insurance benefits to which he was not entitled, precisely because non-irrigated cotton planted behind harvested wheat was excluded from such coverage. He had not returned the money. Adopting the strategy now urged by the petitioners would thus have been prejudicial to Lawyer Wheeler – and thus risky – perhaps leading to convictions on all six counts of the indictment, even though it appears that the government had never requested the return of the money. Thus, the strategy now proposed by the petitioners would not have meshed with the overall defense strategy in the case – a strategy that led to dismissal of the charges or acquittal on four of the six charges facing the petitioners at the time.

"A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. The court is not to analyze counsel's actions in hindsight, but rather to judge his or her decisions in a "highly deferential" manner. *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994); quoting *Strickland*, 466 U.S. at 689.

The trial counsel in this case performed not only adequately but highly competently, providing a rational, spirited defense to multiple charges. The petitioners have not set forth which of the sixty-two witnesses would have provided additional testimony, what that testimony might have been, nor how the absence of such testimony rendered the entire trial "fundamentally

-19-

unfair." *United States v. Faubion*, 19 F.3d 226, 228 (5th Cir. 1994). Further, the petitioners have not proved the viability of their newly offered defense. Finally, even if their proposed defense were valid, the murkiness of the disaster relief statutes and the deference the court must give to strategic decisions of trial counsel require a finding that trial counsel performed adequately under the Constitution.

For these reasons, the court finds that the instant petitions for writs of *habeas corpus* are without merit and shall be denied. A final judgment consistent with this memorandum opinion shall issue today.

**SO ORDERED,** this the 25th day of April, 2005.

/s/ Neal Biggers

NEAL B. BIGGERS
SENIOR U. S. DISTRICT JUDGE